The Honorable Judges of the United States Court of Appeals, in this one the Second Judicial Circuit. Hear ye, hear ye, hear ye, all persons having business before this Honorable Court are admonished to join ears and give their attention to the court of self-sitting. God save the United States and this Honorable Court. Good morning, all. Good morning. Thank you for having me, a special thank you for all your guidance at this time. Our first speaker this morning is the United States v. Peterson. May it please the Court, three of Mr. Peterson's convictions relate to a loan from the Greenwood State Bank. With respect to those convictions, the government relies on statements in a loan form that Mr. Peterson did not write, did not read, never knew about, and never approved. Rather, the statements in this form, Government Exhibit W7-4, were written by the bank's president, Mike Weber, and Mr. Weber testified in trial that this form was used for the bank's internal use only. In response to a leading question on direct examination, Mr. Weber assumed that he got the information that he put on this form from Mr. Peterson. But upon a more pointed question, it was clear that Mr. Weber had no memory that would support the assumption that he made during that testimony. Mr. Weber testified that he couldn't recall when he met with Mr. Peterson, how many times, where that had taken place, and most importantly, he couldn't recall any specific conversation that the two had ever had about the loan or anything else. Well, where else would you have gotten the information that was put in the loan? The most logical inference that could be drawn is that the information came from Attorney Patrick Sweeney. Sweeney was the attorney for Peterson Properties of Chicago, PPOC. And in contrast to Mr. Peterson, for whom there was absolutely no documents, calendar entries, emails, or anything else showing that the two men had ever met, or showing what the content of any such conversations would be, there was a specific email that confirmed that Mr. Sweeney and Mr. Weber had met. It also confirmed that they had met about the loan. Mr. Sweeney's email dated, I think, October 25, 2007, said something along the lines of, good to see you yesterday, Mike. Please send me the loan package checklist. I will give you the use of proceeds statement. Was this a new banking relationship? This was a relatively new banking relationship. The testimony was then brought to the bank by Mr. Sweeney, the attorney, who was good friends with Mr. Shipley, who was another executive of the bank. And so that was another connection that Mr. Sweeney had to the bank in addition to that email that showed up. He was acting on behalf of your client. He was acting on behalf of PPOC. There's no testimony in this record whatsoever that Mr. Peterson gave Mr. Sweeney any instructions and told him to go more by the commission of the bank. He was the principal of the company. He was the managing member. They each owe him one-third of the company. Correct. He was taking instructions from your client. There's absolutely no testimony to that effect. There's a theological instance of this. I don't believe so because when we come to a false statement, we have to know what exactly was said and in what context. We don't know what, if anything, Sweeney. We're already speculating that it's Sweeney, but if we assume it's Sweeney, we don't know what Sweeney said. We don't know what Sweeney was told.  And we have no emails or any other written records. As I indicated, there's the one email from Sweeney saying, good to see you yesterday, but not outlining what the proceeds were for. That's correct. There's no letter or email from Sweeney or Peterson or anybody else that said, we'd like this loan for these purposes. And one problem is when we don't have the specific words or context used is this could have been a 20-second conversation between, who knows, again, Sweeney, Peterson, or it could have been one of the other members of PTOC, or it could have been an hour long. We don't know when Mr. Weber fills out this form and he just says simply land improvement and site improvement, whether that's just his shorthand, his understanding, his best guess, whether because this is an internal form, he figures he doesn't have to report everything that PTOC told him at the loanless floor. And all he's using this form for is to get the ball rolling. And so he's like, well, this is one of the purposes. I'll put that on. Again, nobody saw this form. Nobody had a chance to approve it. Nobody had a chance to verify it. And Mr. Weber had no recollection as to what he was told for a jury to judge whether a statement was made at all, whether it was true, false, or ambiguous. Didn't Mr. Peterson sign the loan document at the closing? And on the loan document was the stated purpose of the loan, which is the fraudulent statement. As the government makes clear in its response brief, the statement that forms the basis for this charge with this loan and this commercial loan application, their position is that the loan note is not a substitute for the application. It wasn't part of the application process. They think it corroborates really what it might corroborate is some sort of knowledge. But the note itself is not part of an application. It can't serve as the basis for anything. And again, it's a— But there's no good reason behind it for his absence of information that Peterson had this conversation. I mean, when you sign the note, it's a descriptor. Again, that could be one of the purposes of the loan. It doesn't—there's no indication then that that's an exclusive purpose of the loan. And the specific charge that's in this indictment is that Mr. Peterson lied in making the application. And what we don't have evidence of is him making any statement to the bank. And then, more importantly, we don't know what that statement might have been so that we can judge whether his statement was true or false. It's just simply not fair to convict somebody in a false statement when it's based on perhaps the best understanding or guess of the bank president, who now, because the charge doesn't come for seven years, has no idea what, if anything, was said that time earlier. There's no notes. And the government couldn't call Mr. Sweeney as well. They did not. And if we're left to speculate about what happened, that speculation goes against the government. It's their burden of proving unreasonable. Not all these charges. Mr. Peterson was in charge of the financing of the bank. He was the managing member, and there were problems. Was he in charge of the checking account also? In charge? I don't know. He wrote checks. He had authority to write checks. I'm just trying to see if there's a possibility in the checking for an inference from the information that was supplied. I don't think it's right that an inference can be drawn just because he has one role, that he made a statement, especially when we have the contrary evidence that Mr. Sweeney was the one that was the point of contact in providing information about the loan. And without the specifics, we can't judge whether a statement that he made, if he made one, was true or false. Isn't he saying this is all part of the type of loan, commercial loan? Is that what you're saying? I mean, there's nothing – your point is there's nothing written or written or said that anybody remembers except for the fact that this was a, quote, commercial loan. And in purpose. He said the handling was not part of the loan. In fact, the loan was used for this purpose and others. There were questions at trial about higher costs and soft costs and whether those were appropriately included in a loan. And – but one purpose was that it was used, under anybody's interpretation of the words, for land improvement. So, when the shorthand is used on a note or a closing statement, it's not inaccurate, but it's not part of the application of the statement Mr. Peterson made. I don't think I've ever heard the whole – the entire source of a loan that's paid off with debt for another company that's like the Chamber of Dept. Mr. Peterson took a $250,000 development fee that had been previously approved in the minutes, took that $250,000 and used that as part of a $300,000 payment to a casino. In terms of the remainder of the money, about $193,000 went to pay things related to construction, I'll say, and some of this money is legal fees. $128,000 went for screenings legal fees. $80,000 or so went to pay debt service on a loan that they had pending with Johnson Bank. $200,000 went to Dr. Michael Shapiro, who was another partner that didn't go to Peterson. $200,000 went to Shapiro. And then $200,000 went to Maverick. And we did put in evidence at trial that Maverick was owed money for legal fees that they had paid in the past on behalf of TPO Speed. Right, well, in this case, I'm not hearing land improvement and site improvement. Well, about $191,000. There's $155,000 that went to Mr. Spahr and to an excavating company and another company had $25,000 too. That was $155,000. And then there was some miscellaneous costs getting up to $191,000 that included some legal fees but also, I think, some site, some sorts of site costs. But the problem is what we don't have is the false statement by Mr. Peterson. We don't have anybody who recalls him, what statement he made, when that was, where it was, what was the nature of it, in order for a jury to be able to judge whether it was false or not. That's what's missing at the end of the day. If Mr. Peterson had made the statement that this loan is only for land improvement, we wouldn't have this document. There's no proof of that. There's no proof of that at all. The second issue that we raised in terms of sufficiency of evidence relates to the M&I Bank. And there, Mr. Peterson sent an email to Mr. Paulson, the banker, saying that he would not use Maverick funds for personal use. The question is, was that money used for business use or was it used for personal use? And relying on Mr. Paulson's own testimony, we established a trial of business use for business use. Mr. Paulson testified that a distribution is a business purpose, that a company uses its money for shareholder distributions, that distributions are often paid from lines of credit, that there is nothing prohibiting distributions from being paid out of the line of credit in this particular case. And then we presented ample evidence that, in fact, this was a distribution that was booked contemporaneously at the time. So the jury obviously rejected that theory of the case and accepted the government's theory of the case with respect to this account, which was that the money was directly used to pay out of credit, you know, that it's in effect, because it was wiretapped. You know, it didn't bear any effect in terms of how that distribution was profited. And the jury reached that verdict contrary to all the evidence in the case, because the evidence is just overwhelming that this was a distribution, and a contemporaneous one. The investigation in this case did not begin for a couple of years after this. I can't recall. I think one thing in terms of whether this is a contemporaneous distribution is Dr. Shapiro, who is one quarter owner of Maverick, who also received the distribution, a check is written to him for $200,000 on April 5th, the same day that the money is requested from Mr. Paulson to be wired to the casino. That check is posted on April 6th. So we have proof that the company is acting to pay distributions to both shareholders on that day at the time. There is no investigation underway. There is no other reason. There is no reason to post it as a distribution. I don't think there's any prohibition on a company deciding to pay a distribution to the partner as he wanted directly. In this case, it was to the casino. I don't think that's materially different than if it had gone into his checking account. There was no contrary evidence presented that the books were doctored, that this wasn't a distribution. In the government's brief, they don't seem to contest at all that this was a distribution. They say, well, maybe the jury relied on Mr. Peterson's own email a year and a half later and relied on that. That would have been irrational for a jury, in place of all the other evidence, to rely on an email that the government itself called, I think at least four times during the course of the trial, a lie. At one point calling it an utter and complete lie. So, at the end of the day, all the proof was that this wasn't a distribution. It might not be the most straightforward way to pay a distribution, but they're trying to do it. He provided an itinerary of properties that were being looked at in Utah. The government chose the manner in which to charge these accounts. They chose to say that the statement, I would not use Maverick's money for personal use is a false statement. That statement, I submit, is not false. That is a true statement that was used for the business purpose of paying a distribution, booked at the time, and used as a distribution. How Mr. Peterson uses it after that, I don't think addresses how Maverick used that money. Yeah, I think that's important. The accounting entries are made at the time. If you look at the annual report that was provided by Rick Vanden Heuvel's firm, that attaches all the balance sheets. If you look at the March 31, 2006 balance sheet, there's no distribution listed. There hasn't been any paid. If we look at the April 30, 2006 balance sheet, it shows that $1.2 million in distributions were paid. The other important thing, I think, is that the book showed that the company was highly profitable in that first quarter and making a lot of money, and so they had the funds to pay a distribution. They could have segregated money that came in from FOMAX. I think during the course of a couple weeks here, there was something close to $1.5 million. They could have segregated that, but the line of credence most people think might be easier for the company, not more difficult, to have to segregate and come back. So I think that they were in a position to pay a distribution. I'll save that time for the follow-up. Thank you. And please, the court, what Mr. Albee is doing is actually turning the standard on its head. Because what he wants to do is say, let's have the inferences for the defendant who lost the trial. Mr. Albee made the same arguments in his trial. He wants those to say, those should always work against him. But the standard, as this court is aware, is that all reasonable inferences from the evidence, and the evidence itself should be viewed in a light that's fair for the verdict, which in this case found him guilty. What we have on counts 4 and 8, which is the commercial loan, is uncontroverted testimony from Mr. Weber that said, I got the information that I put on the commercial loan application from Chris Peterson. That's the testimony. He does not recall speaking to anybody else. He vaguely recalls speaking to Mr. Sweeney. But he specifically said, I don't recall getting any information from him about the loan. And what we have in the testimony is, so Mr. Weber's testimony, I got all the stuff on the loan, landslide improvements, from Mr. Peterson. But then we also have corroborated information, which the defense is characterizing in a reply brief as some sort of fallacy of post-mortem. A fallacy has nothing to do with a post-mortem fallacy. It has to do with corroboration of evidence. What you have is you have Mr. Peterson signing a loan closing document that says, these are the landslide improvements, 7-7. And he signs a note, 7-8, that says, oh, these are also for commercial landslide improvements, new $1.5 million landslide improvements. When you take the testimony of Mr. Weber corroborated by the two signed papers that Mr. Peterson signed the day after the funds was done, it's quite reasonable. It's even more than reasonable. For the jury to conclude that Mr. Peterson actually made those statements to Mr. Weber, who reported them, and to simply ask this court now to re-evaluate and to speculate and to do all, to re-evaluate the evidence, which is basically the exact same arguments that were made at the trial level. This is simply permissible under the standards. Well, Mr. Weber did also testify that he couldn't remember any specific complications that he was concerned about. He can't commemorate the whole transaction with Mr. Peterson. Absolutely, Your Honor. And who wouldn't be after seven years? But one thing he did know, he got that information from Chris Peterson. He didn't all of a sudden say, gosh, you know, I'm just going to give money out to a company walking down the street, or there's a guy walking down the street, I'm going to give it to him. He knows who he dealt with. Was there testimony or evidence that there was a relatively new friendship, and did you recall who initiated it? Whether it was the attorney between you and Mr. Peterson or not, or somebody else on behalf of the court? Your Honor, I don't recall how it was initiated. I know there was testimony on personal relationships between Mr. Peterson and various individuals in this group knew various people in Greenwood because they couldn't get the one from Johnson. They had basically kept it out. Somehow or other, there was a relationship there. But regardless, in due respect, regardless of how that deed get started, the question is, what did Mr. Weber testify to? Right. My question relates to the reason for the instances that you asked the jury to draw. It's not Mr. Weber's incomplete memory of the chain of action. If this has been a previously existing family relationship, and we have a pattern of practice of dealing in a certain way, but apparently that's not the case. It's a relatively new relationship. That is correct. And it's not clear who pushed after whom and when. Perhaps, but what we do know is Mr. Weber testified that his point of contact on pages 7 and 8 of his testimony, his point of contact was Mr. Peterson. Okay, and I have a client here. Yeah. Chris Peterson was the point of contact. And number two was that the testimony was, who did you deal with at, who's the point of contact that you received? Chris Peterson. Was it that clear or did you say, I thought, I got it? No, it was that clear on pages 78 of the record. On 159 pages 7 and 8, it came from Chris Peterson. And then you go on. And that was never solved by him? Well, Cross, if any good advocate does, he leads it down in terms of the question. Well, yeah, let's say that. Let's say that. Certainly. But isn't it also the purpose of the jury to draw reasonable inferences, which they did, and then found him guilty, and so I guess it wasn't that effective. I mean, it's hard for you to believe Cross more than you believe the jury. Absolutely, absolutely. And they can also find that this mere statement, because it's hard to recreate that here in this courtroom, certainly based on that whole record. But we do know what the jury heard. And obviously, they credited Mr. Webber's testimony about his contact with Mr. Peterson, coupled with the two documents that Mr. Peterson signed, confirming the exact same purpose of the loan. So as a result, although it's important that there is certainly evidence out there, as Jay said, whether it's they or Mr. Webber can recall every part of the conversation, the most important part is, what was the jury presented with, and what did they hear? And again, that record that 159.7 and 8 make that clear. Mr. Webber recollects speaking to no other members without him. And like I say, he only spoke to Mr. Sweeney. But he has no recollection of Mr. Sweeney providing the information. So as a result, the question becomes, who else could he have gotten it from? And the logical inference is that he got it from Mr. Peterson. And after getting it, he promptly suspended it on things other than the improvements. And again, there's about $155,000 that go to industry support, landmark construction, to subcontractors, and about $38,000 that Mr. Albee pointed out that went to things that were related to it. So about $198,000 of the total amount went to the improvements. The vast amount, well over $700,000, went to other things unrelated and not to the person alone. In terms of the Maverick testimony, Your Honor, what we have here, if I can just draw just a little bit of a picture here. Mr. Peterson goes to the MGM grant in April of 2006. And while he's there, between April 4th and April 9th, he takes out markers of about $1.6 million. And the testimony was, at the end of the trip there, he lost about $494,000. So obviously, because he's taking in distribution, he calls up the bank and says, Oh, I'm taking in distribution, so please wire transfer in money so I can spend the distribution on the gambling I'm doing down here. Oh, no, he doesn't say that. And that's the whole point. The government's point is, is that the testimony that he comes up with is lie about how he's going to take money from the account because he needs the bank to send the money. He needs them to send money to the account. So he has to come up with this concoction about sending Maverick money, not on gambling, which is clearly impermissible, but he wants to send Maverick money on alleged real estate premises. And he not only sends that itinerary once, but he sends it two other times. Twice on the second day before April 5th, he sends it twice. That particular piece of evidence is telling me that if his only reason was to take this alleged distribution, then it certainly would have been handled differently. And putting it into his own account, treating it as a distribution, would have been something else. And again, the idea that somehow it relates or should have been related to a distribution decision, it's really sort of a justification, a bookkeeping justification to explain otherwise stealing the money. And if you think about it, how else was the company going to explain it? They can't say that the owner of the company, oh by the way, you've obviously stolen the money, therefore. How many of the government are interested in a closely held corporation having a shareholder distribution? And whatever the shareholder does with the funds, it's a reference. If that was the case, if that was the case. How do we know that just because he has a million figures, a shareholder distribution, how do we know what the intent is? I mean, here it appears that the evidence is postdated at a particular motive. But what is the concern? Who is the government protecting here? Well, Your Honor, in this case the government is protecting the bank and the shareholders because they wouldn't have given out the money. Mr. Paulson specifically testified. They would not have authorized the transfer, the wire transfer, but for the fact that it was going to dismantle real estate. That's what Paulson, that's what he relied upon. So that really is the evidence. So is there a false reason as opposed to no reason? If he'd given no reason, where would we be? If he'd given no reason, then there would be no false statement. And I don't think that would happen, Your Honor. But it's a false statement to the bank triggering the bank to act and reliance upon that false statement that then caused them to lose the money. Instead of going for business purposes, they went for gambling. In terms of the sentencing arguments, the court is aware that the firm has withdrawn argument 5B-1 regarding the $300,000 repayment to a filed letter with the court indicating that the credit amount that we had found in the discovery of the evidence showed the repayment amount towards the filed letter that was filed on Thursday. And that... Just found out about it? Yes, Your Honor. When we were doing it, the argument itself regarding the $300,000 repayment was made by Mr. Albee at the time of the sentencing that it had been repaid. At that point, when we had gone back, then we went back to the discovery after Mr. Albee's reply to determine exactly whether the repayment was made by the sweep account. I think everybody, including Mr. Albee, had assumed that the money was repaid by the sweep arrangement. Right. And what we found is that, no, there's... In the 40,000 pages of discovery, there is some e-mail that indicates that Mr. Predersen was correcting the repayment of that money. Correct. It was not repaid by the sweep arrangement. So we're under a million dollars for the... We don't believe we're under a million dollars. What we believe is that the $300,000... Well, excuse me for the loss. Correct. We're at the $14,000. Yes, it should be $14,000. So although we believe that it's just an order of conditions to be firm, obviously, it's just that limited purpose of redesigning to level downward because of the... That has an effect on the sentencing. It will have an effect on the sentencing guideline. So you're not confusing the sentencing? Only that there's two resentencing issues. Right. One dealt with gross receipts. Right. Which we believe is a separate issue from this one. In other words, if you find $300,000 repayment, you still rise to the gross receipts of over a million. Right. But the error of assessing 15 levels is a loss amount. It's reversible error. On that narrow issue, right. And we would only say that the resentencing should occur only to award back that $200,000. That's correct. But the content's there. Not only. That's correct. If the court is having more questions, I would not simply ask the court or the conviction just to be firm, other than which one of them you think. Thank you. Thank you, Mr. Jones. Mr. Albert. To be clear, our issue with the Greenwoods Count is not with respect to the use of the proceeds of the loan. It's whether there was proof of a false statement that could support the conviction. And the government's evidence requires speculation as to who provided the information, what was said, and whether it was advertly recounted by Mr. Weber. In terms of the transcript, Mr. Weber's testimony, page document 159, page 39, he says Mr. Sweeney may have been the point of contact. He says his memory of this period is very sketchy. At page 40, he says he can't remember any specific time he met with Peterson, can't remember any specific conversation with Peterson, doesn't have any notes or emails or correspondence with Peterson, is unaware of those things existing. So he acknowledges that this could have come, that Sweeney may have been the point of contact on these things. Ultimately, there's inference upon inference, and the government's evidence can only rest on speculation. There just is nothing that says that Peterson provided the information and what specifically he said that they did ever have a conversation about the loan. Real quickly, I guess I'd like to address the million dollars in receipts. There is the $300,000 that was received from Maverick. So what we have to show is that he received individually less than $700,000 from the Greenwoods loan. The loan was $1.8 million, so our job is to show that $400,000-plus went to other people. $193,000 went to Sparr or other construction or legal people. $128,000 went to Sweeney. $80,000 went to the Johnson Bank for debt service. And $200,000 went to Dr. Michael Shapiro. Off the top of my head, we get about $600,000, which would be the total amount that arguably went to Peterson. We could contest from Maverick, but we don't need to, because that leaves only $500,000 plus the $300,000 involving M&I. We'd have $800,000, and it's less than $1 million in gross receipts individually. We'd ask the court to vacate the convictions on all counts other than count 13, on which we'd ask for a retrial. The government chose to charge specific false statements because it was unable to means for an improvement of the trial in this matter. Failing that, we would ask for retrial on all counts before it resets. Thank you. Thank you, Mr. Halpern. Thank you for your counsel. The case is taken under advisement. The court receives the second case of the day, the United States v. Melendez. Good afternoon, Your Honor. I'm here today on a single-issue, one-sentencing issue, in regards to whether this was a claim to Melendez or was part of the joint undertaking pursuant to 1P1.3. It is our position that the court, although commented to the joint undertaking in regards to the case, the judge was specific in regards to Mr. Melendez's driving or not, or to Chicago and Mr. Craig and British Heroin, that the judge failed to talk about what the guidelines considered the other two steps in regards to 1P1.3 without actually conceding the joint undertaking. The focus of my inquiry at the actual sentencing hearing had to do specifically with the foreseeability. In this particular case, we had an opportunity to cross-examine the co-defendant, Michael Craig. Michael Craig had indicated in his statement that Mr. Melendez was part of this conspiracy. However, in the opportunity to actually examine Mr. Craig, it was evident and it was clear that my client had no idea about the operation that Mr. Craig had. Craig initiated the connections. He was the one who put the cash to my client to drive to Chicago. Mr. Craig rented the car. Mr. Craig was the one who took the heroin. Mr. Craig was the one who buys the heroin. There's some that do, but Mr. Craig testified under oath that my client, Melendez, did not bring money, or not usually money, to Robert, that the money was all Mr. Craig's. That Mr. Melendez did not sell to Craig. Mr. Melendez did not have any idea what the operation was in regards to this issue. The only thing that ties my client into a joint undertaking is the first part of the analysis, but Judge Capallo failed to do the rest of the analysis on this. I'll say it's your own. Do you have any reaction to Mr. Craig's testimony as unreliable? I mean, there's evidence that he relied on the reliability of Craig, the co-conspirator of Tom, but he didn't testify. Although it is interesting to note, Your Honor, that when Mr. Craig was sentenced, that judge, the district court judge, did indeed give him his 5K acceptance of responsibility. So in one regard, in my case, he's saying that Mr. Craig is not credible. But it's actually something that's not credible. He said he wasn't reliable. The judge did not say that he had money. So if you're going to give Mr. Craig his responsibility credit, that's something that's interesting. He said he was unreliable for a whole variety of reasons. He said, oh, I'm going to ask him to tell me his position. I don't understand. That's not what I'm talking about. Yeah, I don't quite appreciate it, but I understand what the court's position is on that. The idea of not discrediting Mr. Craig still doesn't make sense. Where is the foreseeability component? Again, I would note that, as a member, first we're going to have clarity in this particular jury instruction. And I would use that somewhat to follow my argument that it would be a two-step approach. It's not necessarily a two-step approach now. The verbiage and the language is still there. And the third step has to do with reasonably foreseeable in connection to the criminal activity. And so even if they're driving to Chicago to purchase heroin, that doesn't mean that Mr. Millenda understands or has any idea of what is foreseeable in regards to what Mr. Craig is actually doing, in regards to his position in what his operation is. Well, he doesn't need to have complete information about Craig's operation. We don't need to know that they're using their funds to get the bulk of the cocaine. And they're using it looking at their own drug trafficking. So I would argue that the court is indicating that there's a joint undertaking, which is step number one, which is, yes, they got together. They ostensibly pooled some money. I would dispute that, but for the purposes of right now, that they would pool their money and that they would drive to Chicago and that they would purchase heroin. Therefore, we have a conspiracy. Therefore, my client admits his responsibility and pledges a conspiracy. But in regards to specifically the knowledge and foreseeability of what Mr. Craig is doing with his weight, because that's the only way that the judge is able to attribute feedback, the entire weight that Mr. Craig is using for my client. But for background, it would be accessible to him. I believe that I have one minute. So maybe I'll just say that first. I appreciate it. Thank you, Mr. Craig. Mr. Cooper? Please, the court. Ms. Langford is here also on a blunt issue with respect to sentencing. The only issue in Ms. Langford's case is that the district court abused its discretion in imposing a sentence of eight months. In light of her serious health issues, her life expectancy of only 90 months was a better than one in three chance that she would not survive more than 60 months. Her low risk of recidivism and the likelihood that she would successfully complete the period of probation. Frankly, our biggest fear before this court is that the court might adopt a presumption that a within-guidelines range is reasonable and not consider the underlying facts. Let me say a few words about the presumption. First, it's not only not conclusive, it's not intended to be highly deferential, and that language comes from Justice Breyer's opinion of the University of the United States. The second point I want to make about that, and it's a corollary of the first, is that it is possible for a within-guidelines range sentence to be substantively unreasonable and to be an abuse of discretion. The government's cases in their brief even say that in order to sustain the presumption, the district court must provide a justification for the sentence which not only allows adequate health review, but which promotes the perception of fair sentencing. That language seems to impose upon the district judge some sort of burden to show that the presumption ought to apply. The third point I want to make about the presumption is that there's no reason, in this case, for the court to presume that the district court was in a more superior position to make determinations based on the facts, in this case, than did this court. There was no reason for it. You want to keep pushing this, the court, because it's a sentencing. I want to push the court away. That's typical. That's what we see. I want you to take a hard look at whether or not this sentence is justified, or whether it's an abuse of discretion. The point I was making there was that there were no fact-credibility issues because there were no witnesses, and the district court was not in a superior position. This court is in as good a position as the district court, believe it or not. Yeah, that makes sense in your review. Historically, the district court's position that the weight is the facts. I'm just going to argue that it's none of the procedural error committed, and the judge said plenty to justify this decision, and there was a definition that didn't rely on the state. You're arguing that the weight or lack of weight is just a former medical condition, and I understand the core of your argument, and that's why it's substantive. You're asking if that's to our judgments and to the weight that that factor deserves for the district court's judgment. How do you balance that? I'm certainly asking you to substitute your judgment on the weight, but that's not the only thing I'm asking. I'm saying that this judgment's determination of what weight to give for her medical condition, which is essentially no weight, was abusive. There is a point at which your disagreement is not only because you would have done it a little differently, but there is a point at which the undisputed evidence in the case simply does not support at all the judge's determination as to what weight to give. Judge Capallo, I have the highest regard for Judge Capallo, Judge Capallo treated Ms. Lambert the same as he would have treated somebody who was perfectly vigorous and healthy, and yet Ms. Lambert had congestive heart failure. She had this very limited life expectancy as well as quite a number of other medical conditions that are outlined. Right, and the judge took note of all of that, didn't he?  He took note of it, right. But did his sentence reflect what the undisputed evidence showed was a reasonable sentence, and did it promote the perception of a fair sentence? With respect to rehabilitation, which is one of the 35 looking back on it, what we're saying is that the sentence with abusive discretion because it clearly had the undisputed evidence did not satisfy the 3553A factors. I'm going to talk about two of those in particular. One is rehabilitation. 3553A, amongst its requirements, says that the sentence should impose, should provide the defendant with needed medical care in the most effective manner. Judge Rapallo treated Ms. Lambert as if she was a healthy and vigorous defendant. He did not take into account the seriousness of her medical condition, the fact that she was in under the care of various specialists, which had postponed the sentencing hearing quite a number of times, and simply said that he thought the government, the Bureau of Prisons, could not refer her effectively. It was regarded as insupportant. I did point out to the judge that the Bureau's standards for what treatment they are required to provide their inmates is what is minimally adequate, whereas she was getting optimal care from the doctors and specialists to provide. The second 3553A factor that I think Judge Rapallo's sentence disregarded was incapacitation. This 56-year-old lady was not, and still is not, a threat to the city. She clearly committed a number of minor offenses as a young woman, but these were as a young woman for the most part. She had a number of retail theft misdemeanors. She had three felonies, which I would say were borderline felonies, one for disorderly conduct involving a false report to police at age 26, one for a felony for retail theft at age 31, which was shoplifting and solding, and one for retail theft at age 41, 15 years before the sentencing hearing for shoplifting. Nine came in similar. Her involvement in the conspiracy, based on the statement in the plea agreement that was agreed to, shows that it arose from her caregiver role. She was the babysitter for Mr. Craig's children. She was employed by Mr. Craig, and the court found she was subservient to him. Mr. Craig asked her to do some things, which she shouldn't have done. She very foolishly complied with her request, and therefore fell into doing some things that should have helped the conspiracy. I see that I'm left with just a little bit of time, so I would— Let me just ask you one area of inquiry. It seems to me that Ms. Craig stressed on her physical condition, and if I could just put aside her record for a second and just focus on that. Don't we have a district judge who has concluded she does not have, I think in his words, extraordinary physical impairments for which she is seriously confirmed? I mean, I appreciate the question of how you describe it, but this is a finding to have a district judge on what is really a critical anchor in your argument. You have that— He does say that. You have that finding. So is that— Based on undisputed facts that do not support that finding. So you're saying that's almost clear to her? I guess it seems to me. That the evidence against her, regarding her medical condition, is contrary to that conclusion. Absolutely. Absolutely. Thank you. Thank you, Mr. Gilbert. Any other questions? May it please the Court. Joseph Petersen, on behalf of the United States. Excuse me. Yes. Oh. Oh, got it. No reasons. We're in Wisconsin, so. Um. Um. Um. Um. The district court correctly calculated the amount of heroin treated in defendant's land names. In addition, the district court also invoked a sustainably beautiful sentence as to defendant's land name. Therefore, we're asking that both defendants condition in the sentence be confirmed. Specifically, as to defendant's land names, the district court found that the most reliable evidence of the drug undertaking in this case came from the defendant's own statements, including the statement that we admitted to be part of a conspiracy with Michael Craig, to distribute heroin, as the professor was intended to say. And that, as part of that conspiracy, the two of them pooled their money together, and they usually served about $4,000 in purchase of heroin for $8 a gram for reduced weighting. So when the defendant today argues that they dispute that evidence, in addition to that, regarding the fact that they pooled the money together, the district court found that this was not based on anyone else's testimony, other than the defendant's own statements, including the definition that we admitted. So we believe that the district court correctly credited, or correctly attributed, all the heroin that the defendant and Michael Craig jointly purchased during their trip to Chicago every two to three days during an eight-month period, as the defendant admitted. Therefore, there was no error in the district court's calculation of defendant's testimony. So if you must, if you have questions regarding the defendant's land names, I will move on to the defendant's land names arguments, and I would just agree with what Judge Seif said regarding the standard in this case. The defendant is asking you to do is get a second opinion regarding Before you get back into the frequency of the trips to Chicago, was there an issue with regard to that? Or was that what they made in their plea brief? They said they weren't that frequent? In the plea brief, the defendant admitted that they went to Chicago every two to three days to purchase heroin, and there was additional testimony regarding this. But once at the time that they went, the judge decided to take the most conservative testimony that they had at the time. In the eight months, the defendant was going to be sent on to the judge. And then as far as the frequency of the trips, the judge calculated conservatively every two to three days, basically every two and a half days, versus two and a half days, about a third of the time. Anyway, that was a language that was used regularly and was by a bond or by a debtor. That was the defendant's admission when he was first approached by law enforcement officers that he affirmed the relationship between him and also his plea brief. There was an interest in a letter from the statement about the amount of heroin that the money purchased. Correct. He said that they would take $4,000 to purchase heroin for $8,000 per annum. But then he also stated that they were buying between $25,000 and $40,000 per heroin. And just about, again, conservatively, found that there was $13.5 million that was purchased each time he was in Chicago, even though the defendant believed that he had been there more than once. Right here in the statement. Correct. As a 2% member, it's not the role of the supporters that you hang on with in district court sentencing evaluations and ways that they can support a place. I don't know if any of you have different arguments for the evidence that I was presenting, but the district court did in this case specifically consider all the defendant's arguments in the case, and re-sentenced the other evidence in the case. Did you see that preliminary letter at all in the statement? Well, the court found that the defendant did not show any reflections that he was an average participant. I mean, in addition to admitting that she had allowed heroin to be sent, processed, and stored in the apartment, that the medical credit paid for her, but didn't promote the charge, she also allowed first aid services. Right. Right. Well, and also so that heroin could be stored in her, and that she could distribute heroin to this vulnerable group of members of a 16-year-old student on the defendant's behalf. What was the evidence of her involvement in education? She admitted that she was distributing heroin from time to time to the other individuals that were involved in the conspiracy that actually controlled heroin on the street. She also admitted that she would – She put up her cell check, didn't she, Mr. Parker? Correct. She also distributed heroin to – or, I'm sorry, collected proceeds and then provided them to the clinical credit after those individuals had sold heroin. In addition, she – She also, as part of her investigation, she was caught getting into an apartment block where he lived, threatening him as to where he could go with her heroin that he wished to purchase, and she contacted one of the co-offenders who distributed the heroin, and he made arrangements for them to connect with each other so he could purchase it. So it wasn't just merely that she was at this house and was doing things like that. She was normally involved. And again, without finding out that challenge, other defendants didn't support it. For what kind of involvement? Was that particularly minor, for instance? Was that what were noted as mentioning? You can't talk about law forever. Right. Well, the district court discussed, not only the length of the record, but the fact that she continued to violate court orders when she was a lifetime probationary. Well, one of the concerns that the district court had, though, was that she graduated from a trivial clinic, as you call them, although many of those students got an offensive felony to resolve that accordingly. But she graduated from that at the age of 15 into being involved in a state drug insurancy. And that was one of the things that the district court relied on as part of rejecting the trans-arguments of litigation and finding a sentence within the academic range. And two months above what would have been the academic range was a crime rate. And the district court, in this case, certainly justified in giving her a higher sentence given the fact that she had an extensive criminal history. What is the academic range? We recommended a sentence within the academic range and did not make any specific recommendation. And we got the whole way to the bottom. She got two months above the minimum. She was sentenced to eight months, and the academic range was 78 months. Do you challenge that? Mr. Cooper's assertion... ...her health was... Yes, we do. The district court extensively discussed her... Yeah, but we have a district judge's conclusion. Other evidence... There was other evidence in the record that the court relied on specifically the fact that while the sentence was on pre-trial release, she continued to work, taking care of another individual and another woman. In addition, the defendant had a positive test result for using cocaine while she was on pre-trial release. That is another factor that the court considered regarding her health and medical history. So we believe that the district court decision... And would you say that this is correct? ...arrived in the sentence because it allowed for the medical condition. And we believe that... But the district court... The number is in the 80 months. The 78 was the low end. All right. Eight 80 months. So you're suggesting we should conclude that the decision to go with the low end was the recognition of this health issue as presented by the defense counsel? She had no medical history of any kind. The district court, largely, in the sentence referred to a higher sentence in regard to an emergency case that involved an incident of pregnancy. None of the other... I'm sorry. The court, by all means, considered her medical history according to the... What evidence did she present with regard to her medical condition? What type of evidence? She presented a written documentation from a mental health crisis over a period of time. And her attorney provided additional information to the judge about the sentencing to clarify some of the points that were raised. And as the defendant argued, is the court present with an indication that the court has chosen not to give this much weight that the defendant wanted them to? So, there was a lot of expectancy which was provided by some organization that would indicate the fact of it. Is that right? Right. Originally, it was a higher expectancy, but there was an issue of the... So, we believe that the district court did properly weigh all the appropriate sentencing factors, gave the appropriate weight to all the defense arguments and the evidence that they presented, and we would ask that the district court, this court, affirm the sentence of the district court and find the sentence to be announced and the district court. Thank you. Thank you, Judge. All right, Mr. Judge. Mr. Judge, it's time for you to tell us if you have one or two questions. Okay. So, I'd like to just talk about the statement that Mr. Melendez made. This is quite a statement that keeps on pitching as a self-fulfilling prophecy. He's arrested a year before the indictment. He's a 46-year-old Hispanic man who, although speaks English, is marooned in Spanish. He's in a small room with two FBI agents, and you have five lines of a statement that he made, and he typed up, and the entire statement took less than a half an hour. This statement has followed Mr. Melendez to a grand jury, where he is presented to the grand jury with this five-statement document. I'm telling you this, this statement has haunted him. He took the entire time that's gone to the grand jury, went to his plea, and then the judge uses it completely as his sentencing. And the idea that we're continuing in this cycle of sentencing illiterate and poor individuals when they have made a small statement, and then that just carries along with him, seems to me that there has to be some sanity at some point in time. Well, after he had counsel, did he contest it? I came along at the sentencing, and so the complete agreement had already been negotiated. But I'm sure he had counsel then, and there was no record of that. I think he had counsel at the grand jury, but I think what Mr. Melendez's position was is that part of the plea agreement that was negotiated was that he always agreed or admitted that he did not purchase this amount of heroin, that a paragraph of his plea agreement did allow him to argue at sentencing that it was, I think it was, 10 grand out of the 40 grand. And so I think he relayed that component of this and allowed him to have the ability to argue as I did at sentencing, and that's why he had a very lengthy sentencing period. I see that my time is up, so if the court has no other questions, I would ask that you, based on a clear error in regards to gatherings, that you will return the sentencing issue and send it back to the judge from 17 April. Thank you. Thank you, Mr. Cooper. Mr. Cooper, your time has started, but you may have a petition. I just want to respond to the question regarding where the medical evidence came from, so I'm clear on that. We had voluminous medical records from this letter, most of which was provided by the probation department committee, and I had summarized them and asked that they included the pre-sentence report, which it was, along with some definitions of medical terms that came from online research, so there's a great deal of detail in that pre-sentence report. The Seattle Heart Failure Minority studies that came up with the seven-and-a-half-year life expectancy was attached to the sentencing memorandum and the second level sentencing memorandum, and there were two of them, and that is a result of simply inputting data regarding background reports, age, weight, and so forth into this program that was devised by a patient on the West Coast and then came up with the seven-and-a-half. So that was where the medical evidence and the life expectancy came from. Unless the court answered any of those specific questions, you may not get the report that the court is demanding from you today. Thank you. Thanks to all the counselors. Mr. Cooper and Mr. Stratton, you were appointed by the court, and you have the additional time to report or give me an opportunity if I need to. Thank you. All right. The case is currently under review. We'll proceed to the final case, Martinez v. Daniel Martinez. Ms. Lozada. Good afternoon. In brief report, my name is Amelia Lozada, and I represent the petitioner Daniel Martinez and Tracy Bileo. This case asks the court to determine the penalties for lethal homicide convictions that have intentional homicide as a private act. Is this, as the government argues, a sentence up to life imprisonment, or is it the same for every other intentional homicide, a mandatory life? Really, the question is whether a person who is convicted of a homicide in purpose of an ongoing criminal enterprise gets a significant sentence not provided to any other defendant who is convicted of an intentional homicide. Report was created with a specific purpose of imposing three sentences on those engaging in racketeering activities. It was a new tool at the time for the government to combat organized crime. The idea was to establish severe consequences, both financial and in terms of imprisonment, for people who engage in a pattern of racketeering activity as a member of a criminal enterprise. That purpose cannot be achieved if a person who is convicted of a lethal homicide faces zero life, when every other defendant convicted of an intentional homicide faces mandatory life. Finding that the defendant is mandatory means that Miller v. Alabama applies, and he is a felon charged by the Kentucky Penitentiary. When it comes to Miller v. McCartney, we are in agreement on several points. First, we agree that it applies to mandatory sentences. Second, we agree that it applies to juveniles under the age of 18 at the time the crime was committed, and here, both Martinez and Leico were under the age of 18. Third, we agree that it doesn't mean limiting the possibility of a life sentence, but it requires the court to consider specific factors related to age and characteristics. Finally, and perhaps most importantly, we agree that it applies to special activities. So this all turns on where the penalty is, and whether it's mandatory or not. Right, you don't have to take over the court. Right, so you're fighting the issue of the interpretation of that, so you're going to have to come up with the other issues as well. Okay. The number of being incarcerated is the... I think the number of being incarcerated is sort of a question of whether it's procedural or substantive. Right. Well, that's true, but there's only been two circuits to address the issue. Right. It is getting reported, so it's being reported. Right. Right. That's true. Okay. Right. Right. Right. Right. Right. Right. Right. Right. Right. Right. All right, but. It's a problem in warm. So it's a. And they can't have a particular reason. Okay, but I need to incorporate it. Incorporated. The way that you look at the. The presumptive. Is based on the guidelines. And the guidelines incorporate the underlying. So a person. With the guidelines. They started. But if you look at the underlying. And you use whatever is higher. Okay, you can. Okay. I didn't the difference when they got them mandatory. Because you got it. And range in. Why is. It. With the guy. That means. That the. Drop off. And that. A person. Who is. Committing criminal acts. As part of an ongoing. Crimes. That we. Did. Last time. As they happen. To recover. Okay. I'm not sure. I understand. It is. No. Sure. The guy. We're talking about. The statute. Yes. And. For. Your. Reading. The whole. Language. Yes. For. A week. You didn't. Have. Medical. I think. I guess. What I'm saying. Is that. The minimum. Is late. And the maximum. Is late. And you have to read. It out. And the. The reasonable. Interpretation. Is that. It's. Okay. I'm. I think. The.  Has a vision. And we. See. When it files a.  K. One. Motion specifically. Asked for. A level. Regression. In. Language. But we're. Coming back. To story. And we. Don't. Word. Would it. Do. What. And some of. The death. Other. Everything. He. Too early I can't. Do what.  Wondered about the world. I mean. No you. Haven'tges. We have. This. And. The reality. Here. A. We have no. Is going to happen it is a good thing that all undergone preparation. I'm sure we do. I see. everything. you. So I encourage the court to take a look at the text, again, in 1953A, if you don't have it in front of you, that's pages 20 and 21 of the government's brief. I'll summarize the beginning, so the message says that, someone who violates a RICO's offense shall be fined under this title, or imprisoned not more than 20 years, and in the parenthetical case, or for life, if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment. And so it's clear on the basis that when you have a racketeering activity that authorizes up to life, that is a maximum penalty of life, then in the parenthetical case, and so you would read it as imprisoned not more than for life, if you're in that situation. Can you repeat that one more time? It already needs to be there for at least 20 years to say what is the following condition. The following condition is if you have this racketeering activity up to a maximum, then the maximum goes down to life. I think it's critical to see here that if you were to want to read this as saying imprisoned or for life, as in mandating a life sentence, then you would be in a world in which you would have to mandate a life sentence for every time you have a racketeering activity that authorizes up to life. And so I've already discussed the drug trafficking, or other activities like arson, or drug robbery, things that are far short of an intentional murder. And so that is not an interpretation that even petitioners are willing to argue. On the first page of their reply, they concede that they do not read this as mandating a life sentence. So it is your question, and it looks as if our counsel conceded. But some crimes, including homicide, are mandatory life penalties. There's no maximum. No way. It's just a mandatory life penalty. So, I think the argument is that the those crimes are not more than life sentences that are mandatory life penalties. And it should be disregarded. I mean, that's sort of how I read the part of it here. That's how I read it as well, but I see no basis for that in the text of the statute. And our ordinary rules of construction say that you have to follow the text. Yeah, but you can't say that there's a certainty even when that is not. And so, for crimes that are mandatory life sentences, there's no other possibility, no minimum, no maximum, so there's no range to the point of life. But they're not more than a language. It's a term. You were talking about the history of life sentences. So, I mean, that's a sort of canonized question, right? Okay, so I think the history of the canon is what you would go to next. After the fact, one of the next things we look at is the legislative history. Your legislative history is clear both in the House and the Senate materials that what Congress meant to do was to, in your other words, authorize or permit sentences up to life, not the possession that is mandated by sentences. You look at the statutory context. There are neighboring provisions that involve intentional homicide, and they make very clear that they're mandating life or more death. That language is not comparable here. Was it in the RICO? Yes. It points to Section 1959. It's a RICO murder offense. And that's critical to the statutory context, because 1963a applies a broad range of offenses. Again, it comes to trying to do arson or armed robbery. And the district here pled guilty not to an intentional murder offense. If they did, then they would have known. They faced mandatory life. They struck a deal, and they pled guilty to a summons and a brief account in 1962, which is punished under 1963a and clearly did not mandate life. Then wouldn't you be charged for being a murderer? They could have. They did not in this case. But that's the point, is that the genome context is often charged under any number of sentences that may well cover or carry different penalties. And so it would be completely improper to say that just because of a mandatory minimum, it exists for this context somewhere else, that you would import that mandatory minimum into this offense. There's no canon interpretation that would support that. The idea that petitioner's reading is needed to avoid an absurd result, I don't think is accurate either. And this case shows why. When you do have intentional murder in a brutal fashion, shooting a good Samaritan, as well as other predicate offenses or attempted murders, then the judge can exercise his discretion and impose a life sentence. So there's no anomaly here. And the idea that there's a need to avoid an absurd result simply is not the case. I wanted to pick up on another point that Judge Spikes made, which is that the underlying racketeering activity to which the petitioner is likely guilty was not a federal crime since it was one that the petitioner had studied. Instead, it was the Wisconsin First degree murder statute. And as she just noted in her argument, that allows the sentencing court to give life with parole. And so even under her notion that she would be incorporating the mandatory provision of the right of the predicate, then you would not be unrevealing because here the predicate, the Wisconsin law, did not mandate life without parole. It was life with parole. Now, again, there's no agency to incorporate the mandatory minimum, but it just shows that her argument is not working. In deciding this case, it occurred to the courts most clearly at Croft v. Williams. The court decided that case just very recently, and it was very analogous. Croft v. Williams involved a Illinois statute that resulted in a life sentence. And this court denied the Miller argument because the Illinois statute clearly made the life sentence discretionary. And so their court did not reach the Miller issue. The court can reach that same result here in a very straightforward fashion. More than that, if we look at the sentencing record here, very clearly the district court understood it to help them have discretion. They went through a very lengthy, 35-53 analysis that addressed each petitioner's individual circumstances, not only their age, but also the effect of their age, their immaturity, their family circumstances, the fact that they began using substances at a young age, the fact that they got involved in the Black and King Bend identities, and how all these things would result in poor judgment, immaturity. And he nonetheless decided, mainly because of the brutal nature of this crime, to impose a life sentence. And so it was an individualized assessment, which is what Miller calls for, so there's no need to remand in this instance. And again, I come to Crawford v. Williams, because to the extent that in the reply brief she's arguing that there wasn't enough of a consideration of the individualized nature, Crawford v. Williams makes clear that you don't have to impose a new Miller sort of review when you have a discretionary statute. You stop once you decide that this is not a mandatory life sentence. That's the end of the inquiry. And so in Crawford v. Williams, all that the sentencing court did was say that it considered the pre-sentence report, which articulated the defendant's age. And that was sufficient. It wasn't necessary for it to articulate lots and lots of things about the individual's offenses. In comparison here, Judge Randall considered thorough discussion of the individualized circumstances. And there's no need for the sentencing here. So the government's position is that we shouldn't address Miller? That's correct. I don't think there's any need for you to raise that issue here. That's just how the case is decided in Crawford v. Williams. I may have you address questions on the Miller reply brief issue, but again, I really don't think it's necessary. The court will be hearing argument on that on October 1st, and very soon. I think it's true that there are just two other circuits that, on the merits, have said it is procedural. So that's correct. There are a number of state platforms that are going both directions. I think there's a fair assessment of the circuit, yes. I don't think there's any need to do that in this court. You could proceed to the tribunal on the first issue. Alternatively, if you really have heartburn about it, I don't think that's necessary. Why wait? You know better than they do. There are no other questions about it. The court is adjourned. Confirm the judgment of the law. Judge Randolph is ruling on the 2255 motion, and duties bind that anyone else understood that he had discretion when he imposed the life sentence. Therefore, this hearing is adjourned. Thank you very much. Thank you. Thank you. Thank you. Thank you. There was no murder in fact. There was no murder in fact. Yes sir. Thank you. Thank you. Yes sir.  Yes sir. Yes sir. Yes sir. Yes sir.